**CORNELL RESEARCH FOUNDATION, INC., and Cornell University,**
Plaintiffs,

v.

**HEWLETT PACKARD COMPANY,**
Defendant.

No. CIV.A.5:01–CV–1974 (NAM/DEP).

United States District Court,
N.D. New York.

Dec. 9, 2003.

Sidley, Austin, Brown & Wood (Edward Poplawski, Esq., Denise McKenzie, Esq., Sandra Fugiyama, Esq., of counsel), Los Angeles, CA, Cornell University, Office of Counsel (Nelson Roth, Esq., of counsel), Ithaca, NY, for Plaintiffs.

Hiscock, Barclay Law Firm (Robert A. Barrer, Esq., of counsel), Syracuse, NY, Gray, Cary Law Firm (Stewart Brown, Esq., Licia Vaughn, Esq., Barry Shelton, Esq., John Allcock, Esq., of counsel), San Diego, GA, for Defendant.

*DECISION AND ORDER*

PEEBLES, United States Magistrate Judge.

This is a patent infringement suit brought by plaintiffs Cornell University and its technology arm, the Cornell Research Foundation, Inc. (collectively "CRF"), against the Hewlett–Packard Company ("HP"), a preeminent manufacturer of electronic equipment and apparatus, including computer processors. At the heart of this action is a patent issued in 1989 and held by CRF, as assignee of the patent inventor, Hwa C. Torng, for a computer processor instruction issuing system and method. The issues in the case include the appropriate claim construction to be afforded to the patent at issue; its validity and enforceability; whether the patent was infringed by HP; and if so, what damages were suffered.

Currently pending before the court is a thorny discovery dispute consisting of several discrete components. Court intervention was first sought by CRF, which claims that HP has failed to produce materials falling in a variety of somewhat broad categories. For its part, HP has countered not only by asserting its good faith compliance with all outstanding discovery obligations, but additionally raising the issue of CRF's own discovery shortcomings. As has been the case in all matters since inception of this litigation, the parties' discovery dispute has been vigorously contested and resulted in the generation of extensive submissions to the court, obviously a function at least in part of the high stakes associated with the controversy.

## I. BACKGROUND

On February 21, 1989 United States Patent No. 4,807,115 (the " '115 Patent") issued to CRF, as assignee of Dr. Torng. Amended Complaint (Dkt. No. 43) ¶ 6. The invention at issue in that patent relates to an instruction issuing system and method for processors with multiple functional units. *Id.* In simplistic terms, CRF contends that the method-

ology described in the '115 patent allows for the non-sequential proceeding of instructions, thereby greatly enhancing the speed at which the device in which the processor is located operates.

According to CRF, HP has infringed the '115 patent through the manufacture and/or sale of a line of processors, including those referred to by HP as its PA–8000 Series.[1] Amended Complaint (Dkt. No. 43) ¶¶ 9–11. Plaintiffs' complaint also asserts the integration by HP of accused devices into its line of servers and work stations and, as will be seen, therefore seeks damages based upon the presence of the processors in those systems. *Id.* ¶ 11. Plaintiffs' complaint alleges direct, inducing and contributory infringement of the '115 patent, and seeks a variety of relief including permanent injunction and damages. *Id.* "Wherefore" clause.

In its answer to the amended complaint, HP denies infringement and has asserted various affirmative defenses, including estoppel, laches, in-equitable conduct, and patent exhaustion. Answer to Amended Complaint (Dkt. No. 47) ¶¶ 3–31. HP has also counterclaimed seeking declaratory relief including on the issue of non-infringement, patent invalidity, and patent unenforceability. *Id.* Counterclaim ¶¶ 1–15.

To place the current multifaceted and extremely complex discovery dispute in context, it is necessary to understand the nature of HP's business as it relates to the accused products. Implicated in CRF's claim of infringement of the '115 patent is HP's manufacture, as well as the manufacture for HP's use by other companies, including International Business Machines ("IBM"), Intel Corporation ("Intel") and potentially others, of microprocessors which are also sometimes referred to as central processing units ("CPUs") or chips. Such processors have many functions and characteristics, among them being the manner in which instructions are ordered and processed—a matter which falls within the purview of the patent at

---

1. The processors which are identified by CRF as potentially infringing include those marketed by HP under the model labels PA–8000, PA–8200, PA–8500, PA–8600, PA–8700, PA–8800, PA 8900 and Mako. *See* Amended Complaint (Dkt. No. 43)

¶ 10. Throughout this proceeding the parties have referred to these accused devices collectively as the PA–8000 family of processors, and I will do likewise.

issue. A processor is one of many components comprising a "mother board", which may be used in various computer hardware, including desktop computers and servers.

As noted, many of the accused devices are processors manufactured by HP, primarily though not necessarily exclusively for its use in other products such as HP servers and workstations.[2] Some of the accused processors are manufactured for HP by other companies, including IBM and Intel. CRF acknowledges that Intel is a licensee under the section '115 patent, giving rise to HP's contention that it is shielded from liability by virtue of a patent exhaustion defense with regard to any processors manufactured by Intel and purchased by HP. There apparently is a question as to whether IBM is similarly licensed by CRF under the '115 patent.

According to the parties' presentations, HP does not sell processors. Instead, it sells other products, including servers and workstations, in both its name and, in certain cases, the name of other manufacturers, which in some instances may contain the accused processors as a component. As will be seen, it is the inclusion of the accused processors in other products that has led to a part of the instant discovery dispute.

## II. PROCEDURAL HISTORY

CRF commenced this action on December 27, 2001. Dkt. No. 1. On August 30, 2002 an order was issued permitting plaintiffs to amend their complaint. Dkt. No. 41. An amended complaint was thereafter filed on behalf of CRF on September 6, 2002. Dkt. No. 43. HP responded to CRF's amended complaint by the filing on September 19, 2002 of an answer, which includes counterclaims against CRF seeking declaratory relief, as previously noted. Dkt. No. 47. CRF has since answered plaintiff's counterclaim. Dkt. No. 52.

Following the commencement of suit, a pretrial conference was conducted pursuant to Rule 16 of the Federal Rules of Civil Procedure. At that conference it was determined that the discovery process in this case would be bifurcated, with the initial focus being upon matters relating to claim construction, and all other discovery to follow. A case management schedule was accordingly put in place allowing discovery to proceed with respect to the issues associated with claim construction, but precluding the parties from engaging in discovery with respect to all other issues until October 1, 2002. *See* Dkt. No. 11.

The case was the subject of a lengthy in-person claim construction hearing before District Judge Norman A. Mordue, beginning on April 29, 2003.[3] Following that hearing, decision concerning the claims construction issue was reserved, and has not yet been issued.

The genesis of the pending discovery dispute was a letter from CRF's counsel, Edward G. Poplawski, Esq., dated February 26, 2003 (Dkt. No. 164), requesting a conference with the court and outlining various areas of disagreement between the parties. That letter was met with a written response, dated March 3, 2003, from Stewart M. Brown, Esq., one of the attorneys for defendant HP (Dkt. No. 165), asserting that the parties had not yet conferred in good faith and reached impasse concerning the matters raised in Attorney Poplawski's letter, and suggesting that such a course of action be taken prior to court intervention. A conference was subsequently conducted by me on April 9, 2003 to discuss the matter preliminarily, and a briefing schedule was thereafter developed in connection with both the original CRF dispute and matters raised by HP during the conference regarding CRF's alleged discovery shortcomings. Following the submission of extensive materials associated with the parties' disputes, a hearing was conducted on May 14, 2003 to address the various areas of disagreement.[4] Following that hearing, deci-

---

2. During oral argument defendant's counsel advised that HP may manufacture processors for use by other companies, though this is a relatively small segment of its processor business. 5/14/03 Tr. (Dkt. No. 115) at 47–48.

3. That hearing was conducted in accordance with the Supreme Court's decision in *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

4. The pending discovery disputes were also addressed briefly during a hearing conducted on

sion was reserved on all matters presented in the parties' submissions.

## III. *DISCUSSION*

### A. *Duty to Confer*

The local rules of this district court, not unlike those of many, if not most, trial level courts, require that prior to seeking court intervention concerning a discovery matter, the "[p]arties must make good faith efforts among themselves to resolve or reduce all differences relating to discovery prior to seeking court intervention." Northern District of New York Local Rule 7.1(d)(1). The importance of this provision cannot be overstated; the proper functioning of this rule ensures that when limited court resources are taxed to address discovery disputes, they are in fact ripe for determination, the issues have been framed for the ease of the court, and the parties are firmly convinced of their inability to arrive at a mutually acceptable compromise among themselves. *See Roy v. DeAngelo*, No. 95–CV–822, 1997 WL 567960, at *3 (N.D.N.Y. Sept. 12, 1997) (Pooler, J. & Scanlon, M.J.) (noting policies behind prior version of rule); *see also Murphy v. Barberino Bros.*, 208 F.R.D. 483, 484 (D.Conn.2001) (noting policy behind similar rule and that the plaintiffs' counsel had "wasted the time of this court and defense counsel" by not following it).

In this case, the parties have been unable, in connection with this and many of the various other discovery disputes which have to date arisen, even to agree on whether they have fully satisfied their obligations to meet and confer in good faith, and that the dispute is fully ripe for determination. Moreover, based upon my review of the parties' many submissions in connection with the pending cross-motions, while I do not doubt that the parties have conferred and that communications have been exchanged, I could question the sincerity level of the parties' desire to resolve their differences amicably, through compromise, without the necessity of court intervention. Nonetheless, despite my lack of conviction that the parties have meaningfully conferred and reached impasse on each

September 23, 2003 in connection with another

of the many issues now raised, I will address the matters raised in an attempt to keep this case on track toward trial before the assigned district judge.

### B. *Overview*

As I stated at the outset of the May 14, 2003 hearing, one of my primary objectives in undertaking this exercise is to ensure that the parties have the same understanding concerning the scope of each particular discovery request, and that the inquiring party is fairly apprised by the response that all documents covered by the request which are currently in the possession, custody or control of the responding party either have been produced or, to the extent that any have been withheld, are identified with sufficient particularity and the basis for objecting to the requested production has been clearly articulated. This is an objective which has proven to be more easily stated than applied in this case. This task is exponentially complicated by virtue of the number and exceedingly broad scope of some of the requests interposed by the parties, particularly CRF. The court's chore is even further made more difficult by the imprecision of many of the responses and an apparent recalcitrance on the part of HP to provide in tangible form the data, which presumably is readily available, that would allow for calculation of certain basic information such as the quantities of accused products manufactured and/or sold by HP, as well as gross and net revenues generated by those sales.

As is the case with any discovery dispute, my analysis of the pending disputes must begin with consideration of the basic rules applicable to discovery. Absent a finding by the court of good cause to expand discovery further beyond the normal bounds—something which the parties have not sought in this action—the governing rules provide that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party[.]" Fed. R.Civ.P. 26(b)(1); *Surles v. Air France*, No. 00CIV5004, 2001 WL 1142231, at *7 & n. 3 (S.D.N.Y. Sept.27, 2001). While Rule 26(b)(1), as amended in 2000, establishes the

nondispositive issue arising in the action.

outer limits of discovery, those boundaries are not absolute, and are subject to various countervailing considerations including the burden associated with production, the rules providing, in pertinent part, for relief from the requirement of production in the event of a determination, *inter alia*, that "the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Fed.R.Civ.P. 26(b)(2)(iii).

As will be seen, many of the objections interposed to the requested discovery invite me to make determinations on matters touching upon the merits of the case, including the various aspects of the parties' many claims and defenses.[5] As a general matter I am disinclined to make such merit-based determinations and foreclose discovery on an issue which ultimately may be found to be highly relevant, depending upon dispositive rulings by the assigned district judge, unless I can conclude that resolution of the underlying dispositive matter can be predicted with some degree of certainty or that the effort and expense associated with discovery is substantial, and greatly outweighs the minimal likelihood that the requesting party will prevail in connection with the particular issue.

With these guiding principles in mind, I will now turn to the specifics of the parties' disputes.

## C. *CRF Motion*

For ease of reference, CRF has identified nine general areas of disagreement stemming from various requests made and HP responses to those requests. Because the CRF designations appear to accurately capture and depict the various areas of discord, and the parties have structured their submissions to address those segregated categories, I will follow CRF's lead and address those nine

categories separately, even though to some degree there may be overlap.

### 1. *Damages Discovery*

CRF's first category addresses certain requests calculated to identify and discover information, primarily documentary in form, necessary to probe the question of damages. In essence, those requests falling within this category were intended to yield information to aid CRF in quantifying the number of accused services made by or supplied to HP, and the number of those devices contained in product sold by HP. The requests also seek corresponding information related to gross revenues and profits recognized by HP in connection with its sale of the accused devices.

In response to this portion of CRF's motion, HP insists that it has provided CRF with the necessary information to understand and reliably determine the revenue and profit information sought, and that it is engaged in ongoing, or "rolling", production of documents to support the data already supplied. CRF replies by indicating that only the most skeletal and incomplete information has been provided, without any indicia of reliability concerning the calculations and how the figures were arrived at or means of verifying the data disclosed. CRF also notes that it has not received information concerning peripherals, including servers and work stations, in which the accused device is included, arguing that under a market value theory such information is relevant to the question of damages.

At the heart of this first issue are CRF Interrogatory Nos. 5 and 6, served on March 27, 2002, which provide as follows:

*Cornell Research Interrogatory No. 5*

> For each HP CPU, Third Party CPU, HP Product and Third Party–HP Product identified in your response to Interrogatory No. 1, set forth by date, manufacturer, and supplier, the quantity and dollar amount of such HP CPU, Third Party CPU, HP Product and Third Party–HP

5. One example of such an issue is the controversy over whether discovery should be permitted to include information regarding the sale by HP of servers and work stations which contain the accused products, the controversy centering upon whether such information would be relevant to the question of damages. *See* pp. 60–65, *post*.

Product made by or for HP or supplied to HP or imported by HP, including a detailed breakdown of that portion of the quantity and dollar amount for which HP contends there is no infringement liability or recoverable damages due to patent exhaustion or the six year time limitation of the first paragraph of 35 U.S.C. § 286.

*Cornell Research Interrogatory No. 6*

For each HP CPU, Third Party CPU, HP Product and Third Party–HP Product identified in your response to Interrogatory No. 1, set forth by date, and customer, the quantity and dollar amount sold, leased, exchanged, or offered for sale by or for HP and the gross revenues and profits (including gross profit and net profit) earned by HP in connection therewith, including a detailed breakdown of the computation of ... profit and a description of the bases for the computation of profit and a detailed breakdown of that portion of gross revenues and profits for which HP contends there is no infringement liability or recoverable damages due to patent exhaustion or the six year time limitation of the first paragraph of 35 U.S.C. § 286.

McKenzie Decl. (Dkt No. 93) Exhs. 4, 5. Also at issue are CRF Document Request Nos. 5 and 6, served on March 28, 2002, in essence seeking documents which either support or contradict, respectively, HP's responses to Interrogatory Nos. 5 and 6. *Id.* Exh. 6, 7. This category also addresses HP's responses to portions of CRF's fourth document discovery request. *Id.* Exh. 8.

HP has responded in various ways to those requests by CRF. In its initial response to those interrogatories and requests, served on or about April 29 and 30, 2002, HP interposed various objections, and advised that disclosure pursuant to the unobjectionable portions of those requests would occur following commencement of the second phase of discovery under the court's case management order. *See* McKenzie Decl. (Dkt. No. 93) Exhs. 4, 5, 6, 7. On January 13, 2003—more than three months after that milestone date—HP supplemented its response to in-

terrogatory no. 5 by interposing a host of objections and, in the end, declining to produce information and supporting documents responsive to that interrogatory, characterized by it as "unintelligible and nonsensical". *Id.* Exh. 4.

A supplemental response to interrogatory no. 6 was served by HP on December 4, 2002 setting forth various objections but providing, in chart form, information allegedly corresponding to the net income earned by HP on its sale of PA–8000 processors for each of the fiscal years 1996 through 2002. McKenzie Decl. (Dkt. No. 93) Exh. 5. In that supplemental response an explanation is given, as follows, detailing the methodology used to arrive at these figures:

The above net income is based upon a calculation taking into account net revenues less several factors, including cost of sales, operating expenses, other expenses, and income taxes. The calculation includes extrapolations, the application of standard percentages reported in HP's Annual Reports, as well as other historical data.

*Id.* No further information concerning the factors utilized or assumptions made, however, is provided, nor is any supporting documentation included or referenced.

Further supplementation with regard to Interrogatory No. 6 occurred on February 12, 2003; after interposing various objections, in that additional submission HP has provided, once again in chart form, figures allegedly corresponding to dollar revenues generated through the sale of the PA–8000 processors for the fiscal years 1996 through 2002. *Id.* The chart purporting to set forth net income for the sale of those processors for the corresponding years is also repeated from the earlier interrogatory response. *Id.* That supplemental response also invokes Rule 33(d) of the Federal Rules of Civil Procedure, advising that the "requested information could be obtained from various HP documents to be collected and produced, although there is no identification of the documents referenced."[6] McKenzie Decl. (Dkt. No. 93) Exh. 5.

---

**6.** That rule provides, in pertinent part, as follows:

HP generally responds to the portion of the discovery dispute centering upon these rather elementary damage requests by asserting the overbreadth of CRF"s demands and pointing to the burden which has been cast upon it to answer plaintiffs' eighteen interrogatories and 209 separate document production requests. Brown Letter dated 3/21/03 (Dkt. No. 92) at 1. HP also describes its discovery efforts as extensive and ongoing, stating that as of the date of its initial response to CRF's discovery motion it had already produced over 40,500 pages of documents in what it describes as a "rolling production" of documents and information.[7] Brown Letter dated 3/21/03 at 1.

As can be seen, the first issue identified by CRF presents at least three sub-issues which I will address individually, for the sake of clarity.

a) *Basic Damage Calculation Data*

■ The calculation of damages in the event of a finding of patent infringement is governed in part by 35 U.S.C. § 284, and can involve various and sometimes divergent methodologies. The damage analysis in a patent case is addressed to the sound discretion of the trial court, and is informed by a variety of factors including lost profits and, in cases where lost profits cannot be established, a reasonable royalty for use of the invention by the infringer. *Rite–Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1543–44 (Fed.Cir.), *cert. denied*, 516 U.S. 867, 116 S.Ct. 184, 133 L.Ed.2d 122 (1995); *State Indus., Inc. v. Mor–Flo Indus., Inc.*, 883 F.2d 1573, 1576 (Fed.Cir.1989), *cert. denied*, 493 U.S. 1022, 110 S.Ct. 725, 107 L.Ed.2d 744

(1990). Quite obviously, critical to the damage inquiry under either the lost profit model or the reasonable royalty approach is information concerning the sale of the accused products, including the quantity as well as gross and net revenues produced as a result of such sales. *Ziggity Sys., Inc. v. Val Watering Sys.*, 769 F.Supp. 752, 819–20 (E.D.Pa. 1990).

Given the need for this type of information, which is uniquely within HP's control, CRF is entitled to know the total number of accused devices manufactured by or for HP over the relevant six year statutory damage period, as well as revenue generated during that period in connection with production of the allegedly infringing processors. Unfortunately, the task of responding to CRF's requests concerning gross revenue and net income generated from production of the accused processors has been greatly complicated by the fact that HP does not generally offer such processors for sale. Instead, the accused processors are included in other products manufactured and offered for sale by HP, including servers and workstations. Consequently, according to HP, isolating the information necessary to calculate profits associated with manufacture of the allegedly infringing products is difficult, if not impossible, and requires that various assumptions be made to establish revenue and cost information.

While it is apparently true that HP is unable to provide information concerning profits directly associated with its production of processors, it clearly must have readily available to it, and therefore could easily

(d) Option to Produce Business Records Where the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served or from an examination, audit or inspection of such business records, including a compilation, abstract or summary thereof, and the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as for the party served, it is a sufficient answer to such interrogatory to specify the records from which the answer may be derived or ascertained and to afford to the party serving the interrogatory reasonable opportunity to examine, audit or inspect such records and to make copies, compilations, abstracts or summaries. *A specifica-*

*tion shall be in sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained.*
Fed.R.Civ.P. 33(d) (emphasis added).

7. At a recent hearing HP's counsel advised the court that its efforts to respond to CRF's discovery requests have involved 3285 hours, expended by some 206 HP employees, resulting in production of 56,000 pages of discovery materials. While these efforts are not to be minimized, the significance of these statistics is entirely dependent upon the nature and quality of information disclosed as well as consideration of what documents are being withheld from disclosure.

provide to CRF, information which could be used to assist the plaintiffs in verifying or discounting the information already provided by HP and, if necessary, to make their own calculations based upon the actual sales by HP of product containing the accused processors. Accordingly, HP will be directed to prepare and provide a response which succinctly sets forth the following information with regard to the PA–8000 processors:

1) the number of processors at issue manufactured by HP, broken down by specific accused product and by year;

2) The number of accused processors manufactured by other vendors and sold or imported to HP, broken down by specific product, year, and vendor, and reflecting the amount paid to each outside supplier for all such product in any given year;

3) The number of accused products sold by HP, including to other manufacturers such as IBM and Intel, sorted by product, year, and customer, and reflecting the amounts received in gross revenues as a result of those sales; and

4) A description of the methodology employed, and specific documents relied upon, by HP to calculate net profits associated with its sale of the accused products, as set forth in its responses to Interrogatory No. 6.

In addition, HP will be directed to produce to CRF all documents consulted, relied upon, or utilized in any way in the preparation of the foregoing information.

b) *Information Related To Peripherals*

■ In addition to data concerning the manufacture and sale of accused processors, plaintiff also seeks information with regard to HP's sale of peripherals, including work stations and servers, in which the PA–8000 processors are included as a component. In support of this request CRF argues that in arriving at a suitable royalty figure the court should employ the entire market value methodology, described by Federal Circuit Court of Appeals as follows:

The entire market value rule allows for the recovery of damages based on the value of an entire apparatus containing several features, when the feature patented constitutes the basis for customer demand. It is the financial and marketing dependence on the patented item under standard marketing procedures which determines whether the non-patented features of a machine should be included in calculating compensation for infringement. In establishing lost profits, the deciding factor ... is whether normally the patentee (or its licensee) can anticipate sale of such unpatented components as well as of the patented ones.

*TWM Mfg. Co., Inc. v. Dura Corp.,* 789 F.2d 895, 901 (Fed.Cir.) (internal quotes and citations omitted), *cert. denied,* 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986).

The parties both acknowledge the vitality of this rule in general, but vigorously differ concerning its applicability to the case at bar. CRF notes that the accused HP processors are typically marketed by HP as components of its servers and work stations, and that they form an integral part of those products. In reliance upon its position CRF cites, *inter alia, Bose Corp. v. JBL, Inc.,* 274 F.3d 1354, 1361 (Fed.Cir.2001), a case in which the court permitted the calculation of a reasonable royalty to be based upon entire value of an integrated loudspeaker even though the patented invention—a port tube—comprised but a small component of the system, and *Fonar Corp. v. General Electric Co.,* 107 F.3d 1543, 1552 (Fed.Cir.1997), involving a component of a magnetic resonance imaging ("MRI") apparatus.[8]

HP responds by noting that it is plaintiffs' burden to establish the appropriateness of utilizing the entire market value rule, and cites several reasons why it is unavailable to CRF including, *inter alia,* its contention that CRF has never licensed or sought to license such products under the '115 patent, nor is the invention which is the subject of the '115

---

8. During a more recent argument in the case one of the parties also advanced *Code-Alarm, Inc. v. Electromotive Techs. Corp.,* 114 F.3d 1206 (Fed. Cir.1997) (unpublished) as an additional reference for purposes of assisting the court in discerning the methodology to be employed in calculating damages. As an unpublished opinion, however, the decision in that case lacks precedential value pursuant to the rules of the Federal Circuit. Fed. Cir. R. 28(h).

patent used by HP to promote and market such peripherals. HP also asserts that the enhanced obligation associated with providing requested information concerning peripherals is overwhelming, and could increase the expense associated with discovery by as much as an estimated $450,000.

The applicability of the entire market value rule to the facts of this case in the event of a finding of infringement is a matter which, if found to be critical to the assessment of damages, will ultimately be decided by the assigned district judge at an appropriate juncture. I am unable to predict with confidence what that ruling will be, nor would I presume to usurp the assigned district judge's prerogative in deciding the question. At present I cannot say that CRF's position concerning the inclusion of peripherals in the lost profits or reasonable royalty equation is unreasonable, and therefore will permit the requested discovery to the extent necessary to develop basic information concerning quantities and values associated with HP's sale of peripherals, including work stations and servers, which incorporate the PA–8000 processors. Accordingly, HP will be directed to provide the following information relating to the sale of products embodying the accused processors within the relevant six year period:

1. The number of peripherals manufactured by HP which contain an accused processor, broken down by year, identifying each such product, and specifying the accused product embodied;

2. The number of peripherals manufactured by other vendors and sold or imported to HP, or marketed under the HP label, which contain an accused processor broken down by year, product, the identity of the accused processor embodied within it, and vendor, with an indication of the amount paid to any such outside supplier for all such products in any given year;

3. The number of peripherals which contain an accused processor sold by HP to any customer, sorted by product and customer, with an indication of the accused processor embodied within the peripheral, and customer, and reflecting the amounts received in gross revenues as a result of those sales;

4. A listing, by year, of the net revenues or losses generated by HP for the sale of all peripherals containing accused devices;

5. A description of the methodology employed, and the specific documents relied upon, by HP to calculate net profits associated with its sale of such peripherals; and

6. A listing, by category, with sufficient specificity to permit the formulation of a document discovery request, of all documents utilized in the preparation of the foregoing information.

### c) *Implied License/Patent Exhaustion Defense*

HP has reportedly resisted providing information concerning processors manufactured for it by third parties, including IBM and Intel, alleging that there would be no liability for such actions, based upon its patent exhaustion defense, in the event that the vendor was properly licensed under CRF's '115 patent.[9] In that regard HP asserts that Intel is so licensed—and CRF does not seemingly dispute this—but cannot state with certainty that IBM is similarly licensed under the patent in suit.

---

9. HP's position in this regard springs from its patent exhaustion defense, which specifically references Intel and IBM and alleges both to be licensees under the '115 patent. Defendant's Answer to Plaintiff's Amended Complaint and Counterclaim (Dkt. No. 47) Sixth Affirmative Defense ¶¶ 25–31. Patent exhaustion is a recognized defense to a patent infringement claim, and "is based upon the proposition that '[t]he unrestricted sale of a patented article, by or with the authority of the patentee, "exhausts" the patentee's right to control further sale and use of that article by enforcing the patent under which it was first sold.' " *Anton/Bauer, Inc. v. PAG Ltd.*, 329 F.3d 1343, 1349 (Fed.Cir.2003) (citing *Jazz Photo Corp. v. International Trade Comm'n*, 264 F.3d 1094, 1105 (Fed.Cir.2001)). CRF has described the issue on slightly different terms, contending that what is in dispute is an implied license defense. *See, e.g.*, 5/14/03 Transcript (Dkt. No. 115) at 17. The elements of an implied license defense include 1) sale by the patentee of an article that has no infringing uses and 2) circumstances of that sale that plainly indicate that grant of a license should be inferred. *Anton/Bauer, Inc.*, 329 F.3d at 1350.

HP's position on this score is facially plausible, and when assessing damages—should that become necessary—the court may well ultimately agree that HP is not accountable for any of the accused products manufactured for it under contract by IBM or Intel. Nonetheless, I am unable to say with certainty that information concerning such sales is legally irrelevant to the claims and defenses in this action. Indeed, it would seemingly be in everyone's best interest, whether or not an implied license or patent exhaustion defense is found to apply, to know not only the total number of accused processors manufactured or sold by HP but the origin of each such processor so that the precision of the damage calculation can be enhanced, and the court can insure that any award is based solely upon those products for which damages are recoverable.

During oral argument in connection with the pending discovery dispute, HP represented that notwithstanding its objection to the relevance of this information it had in fact supplied the information necessary to allow CRF to calculate the total number of accused devices manufactured for HP by outside vendors, including IBM and Intel, which may be licensed under the '115 patent. 5/14/03 Transcript (Dkt. No. 115) at 52–60. I will direct HP to confirm that this is the case, and to identify for CRF *with specificity* the documents which have been produced containing this information.

In sum, the information sought by CRF in Interrogatory Nos. 5 and 6 and corresponding Document Discovery Request No. 5 should be supplied, subject to the narrowing as set forth herein. I find, however, that Document Request No. 6 is both unduly confusing and unnecessary, and thus its enforcement will not be ordered. Obviously, all such documents relative to the calculation of damages, whether they are internally consistent or conflicting, should be produced, and there is no need to separately state the requirement that contradictory evidence be adduced.

Having reviewed the additional document requests in dispute under this subcategory, I make the following findings:

*CRF'S Fourth Document Discovery Request*

61. Redundant of prior requests—need not be answered.

62. Redundant of prior requests—need not be answered.

64. Redundant of prior requests—need not be answered.

71. Overbroad—need not be answered.

72. Overbroad—need not be answered.

76. Must be answered only with regard to PA–8000 family of processors, together with servers or workstations containing accused CPU units.

77. Must be answered only with regard to PA–8000 family of processors, together with servers or workstations containing accused CPU units.

78. Must be answered only with regard to PA–8000 family of processors together with servers or workstations containing accused CPU units.

79. Must be answered, limited to documents specifically discussing competitors and competition for the PA 8000 family processors together with any servers or work stations containing such CPU units.

107. Redundant—need not be answered.

108. Redundant—need not be answered.

109. Redundant—need not be answered.

110. Redundant and overbroad—need not be answered.

111. Must be answered, limited to accused products, together with servers and workstations containing such allegedly infringing CPU units.

112. Redundant and overbroad—need not be answered.

113. Redundant and overbroad—need not be answered.

117. Redundant—need not be answered.

118. Redundant—need not be answered.

119. Redundant—need not be answered.

The foregoing is without prejudice to CRF's right to renew any of the foregoing requests for information, narrowed in form, based upon demonstrable evidence that such

documents exist and the scope of the request is reasonable, and upon a showing of relevance which outweighs the burden associated with production.

### 2. HP Agreements And Communications With Third Parties

The second component of the CRF motion centers around discovery requests calculated to obtain information concerning business relationships between HP and certain third parties. Those requests seek information, including an indication of HP's legal contentions, relative to defendant's patent exhaustion defense. CRF also urges relevance of the requested information with request to the question of damages, and specifically with respect to the inquiry concerning a reasonable royalty under the '115 patent, such other license agreements potentially bearing upon this issue. See Georgia–Pacific Corp. v. United States Plywood Corp., 318 F.Supp. 1116, 1120 (S.D.N.Y.1970), judgment modified on other grounds, 446 F.2d 295 (2d Cir.), cert. denied, 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971). Implicated in this portion of the dispute are various interrogatories and document requests, including CRF Interrogatory Nos. 7 and 8, served on March 27, 2002 (McKenzie Decl. (Dkt. No. 93) Exhs. 9, 10); Cornell Interrogatory No. 3, also served on March 27, 2002 (id. Exh. 11); CRF's First RFP Nos. 5 and 6, served on March 28, 2002 (id. Exhs. 30, 31); Cornell First RFP No. 1, also served on March 28, 2002 (id. Exh. 12), CRF Second RFP Nos. 31 and 32, served on April 5, 2002 (id. Exhs. 13, 14), and CRF's Fourth RFP Nos. 6–49 (id. Exh. 8).

Once again, the parties are in disagreement as to the level of HP's compliance with these requests, and whether this facet of the dispute is yet ripe for adjudication. It is clear, however, that at least some of the requested information has been withheld by HP on various grounds. HP contends that any request for elaboration of its contentions associated with the patent exhaustion defense, as well as on other issues, is premature, and should be reserved for a time nearer the close of discovery. HP also asserts that discovery on this and other issues is ongoing, and documents are being produced as they are located and collected.

### a) Contention Interrogatories

█ In Interrogatory No. 8, CRF has requested information amplifying upon HP's patent exhaustion defense.[10] HP objects to answering this interrogatory to the extent of providing further information, asserting, among other things, that the use of contention interrogatories in this case is for the moment premature. In addition to questioning its timing, HP has interposed a variety of other objections to this interrogatory and, in a supplemental response served on January 13, 2003, has invoked Rule 33(d) of the Federal Rules of Civil Procedure, identifying what it describes as "documents comprising licensing documentation between Plaintiffs and IBM and Intel", and providing Bates numbering references to documents together totaling eighteen pages. McKenzie Decl. (Dkt. No. 93) Exh. 10.

It is true, as HP argues, that contention interrogatories are often reserved for use at the end of discovery in order to crystalize the issues to be presented to the court, either on dispositive motion or at trial. See, e.g., Shannon v. New York City Transit Auth., No. 00 CIV. 5079, 2001 WL 286727, at *3–*4 (S.D.N.Y. Mar.22, 2001); B. Braun Med. Inc. v. Abbott Labs., 155 F.R.D. 525, 527 (E.D.Pa. 1994). The rationale generally offered in support of this approach is the unfairness of requiring a party to prematurely articulate theories which have not yet been fully developed, without the benefit of pretrial discovery.[11] Braun Med. Inc., 155 F.R.D. at 527.

---

10. Interrogatory No. 8 provides as follows:

Reference is made to HP's sixth affirmative defense (i.e., patent exhaustion). As to each HP CPU, Third Party CPU, HP Product and Third–Party–HP Product, state in detail your contentions relating to this affirmative defense, including an identification of all facts, documents and information relating thereto and each person believed to have any knowledge or information relating to such contention.
McKenzie Decl. (Dkt. No. 93) Exh. 10.

11. Several courts have formalized this position by embodiment into local rules. See, e.g., Southern District of New York Local Civil Rule 33.3 ("At the conclusion of other discovery, and at least 30 days prior to the discovery cut-off date,

Obviously, the wisdom of utilization of such contention interrogatories, and when in the process they should be permitted, will be dependent upon the circumstances of each particular case, as well as the issues implicated. In this instance, fundamental fairness dictates, at a minimum, that HP be required to flesh out the contentions associated with this affirmative defense in sufficient detail to allow CRF to conduct meaningful discovery concerning it. Additionally, although I recognize that discovery is ongoing and any response to this contention interrogatory may have to be seasonably supplemented at appropriate intervals in the future, plainly HP has within its custody or control documents to which it could refer to support its contentions in this regard. I will therefore direct HP's compliance with this interrogatory by requiring it to set forth, in textual form, its contentions regarding this affirmative defense and its factual basis, and to identify all documents, whether or not within HP's possession, custody or control, known by it to lend support to the defense, as well as to list all witnesses with knowledge concerning the patent exhaustion defense. *Cf.* Fed.R.Civ.P. 26(a)(1).

b) *CRF Interrogatory No. 7*

■ This interrogatory seeks to probe the existence of documents bearing upon the nature and extent of relationships between HP and third parties concerning any accused HP–8000 processors. Among the documents sought are those related to any "manufacturing, supply, development, licensing, purchase, research, and collaborative agreement or understanding" between HP and such third parties. McKenzie Decl. (Dkt. No. 93) Exh. 9. While this interrogatory is obviously somewhat broad in shape, its thrust is quite straightforward; in it, CRF seeks to identify, and ultimately to obtain, any documents which would aid in determining the extent of manufacture of allegedly infringing processors by third parties for HP, as well as accused CPUs sold by HP to any such third party companies. CRF asserts that this information is relevant both on the issue of

interrogatories seeking the claims and contentions of the opposing party may be served unless

damages, and in connection with HP's patent exhaustion defense.

The information sought in this interrogatory, one would assume, is readily identifiable and available to HP. This notwithstanding, in response to the interrogatory HP has interposed a litany of objections, both in an initial response served on April 29, 2002 and later by way of a supplemental response served on December 4, 2002. McKenzie Decl. (Dkt. No. 93) Exh. 9. This first supplemental response identified only a single agreement between HP and IBM, dated January 1, 1996, as well as the participants in the negotiations of that agreement. *Id.* In a second supplemental response, served on February 12, 2003, HP identified the January 1, 1996 IBM agreement as well as eight others with that company, as well as one agreement from August, 1998 with Intel. *Id.* HP did not, however, identify any other documents such as invoices or purchase orders which would allow CRF to determine the scope of the manufacture by third parties like IBM and Intel of accused processors or the extent of manufacture by HP of such accused devices for IBM, Intel and other third parties.

Given the relative ease with which such documents can presumably be identified, it is unthinkable that HP should not be required to produce these documents, particularly in light of the existence of a extremely comprehensive confidentiality agreement in place in this case to protect the integrity of any such sensitive information. *See* Dkt. No. 21. Accordingly, I will order full compliance with this interrogatory as it relates to agreements with HP and third parties concerning the HP–8000 family of processors as well as any other CPU units manufactured under other labels or model numbers by or for HP which contain the characteristics now at issue—that is, the ability to process non-sequential instructions allegedly in violation of the '115 patent. Moreover, HP will be instructed to submit to the court and CRF's counsel a certification that all such documents have been produced, with a description of those

the court has ordered otherwise.")

documents and corresponding Bates numbers.

### c) *Cornell Interrogatory No. 3 and RFP No. 1*

Cornell Interrogatory No. 3 and RFP No. 1 seek information concerning any understanding or agreement between HP and any third party relating to or concerning the '115 patent. McKenzie Decl. (Dkt. No. 93) Exhs. 11, 12. These seemingly simple requests have generated the identification by HP of but a single January 1, 1996 cross-license agreement between HP and IBM, together with an indication of those individuals participating in negotiating that agreement. *Id.* A copy of that license agreement was also produced by HP, although initially with apparently substantial redactions.[12]

This particular set of requests appears to present a non-issue, since HP has seemingly complied by producing the only agreement falling within the requested category. Accordingly, HP will be requested only to certify that it has fully responded to interrogatory no. 3, and will be directed to comply with Cornell RFP No. 1, and to supply documents related to or identified in answer to Cornell Interrogatory No. 3.

### d) *CRF Requests Nos. 5–6*

In their first RFP nos. 5 and 6, plaintiffs seek documents supporting, contradicting or otherwise relating to HP's responses to Interrogatory Nos. 7 and 8. *See* McKenzie Decl. (Dkt. No. 93) Exhs. 30, 31. After responding to these requests in an initial response served on April 30, 2002, as well as supplemental responses dated December 4, 2002, and by setting forth various general objections asserted with regard to many of plaintiffs' RFPs in a further supplemental response dated January 13, 2003, HP persists in its objections but states that it will comply when the request, characterized by HP as "unintelligible", is "clarified and nar-

rowed" and states, somewhat cavalierly, that it will respond to other portions of those requests "only as to those products for which Plaintiff provides full, clear and detailed grounds of infringement, including full and complete claim charts setting forth infringement allegations using a precise claim construction" and as to others states, without detail, that plaintiffs are already in possession of other responsive documents. *Id.* Exh. 30. This response is manifestly insufficient. To the extent that plaintiffs are already in possession of responsive documents, HP must nonetheless either produce them or, alternatively, identify to which documents it is referring with sufficient clarity to allow CRF to determine what documents are being referenced and whether they indeed are within plaintiffs' possession, custody or control.

Notwithstanding those objections, defendant HP also represents that it has in fact produced documents responsive to this request, which it characterizes as overly broad, asserting that "[s]ubject to its objections, HP has produced all responsive documents at which it is presently aware." Letter from Stewart M. Brown, dated 3/21/03 (Dkt. No. 92) at 8–9. According to CRF, however, HP has yet to produce any manufacturing or license agreement between it and Intel, as well as other related documents.[13] Letter from Denise McKenzie, dated 5/9/03 (Dkt. No. 185) at 5.

When confined to HP's 8000 family of processors, which for the moment appear to be the only accused devices known by CRF to be manufactured by or for HP, this request seems narrowly drawn and readily understandable. Consequently, I will direct HP to fully answer this RFP to the extent that it relates to such PA–8000 processors, and to identify with specificity any documents that are being withheld that otherwise would fall within the scope of this discovery, setting

---

12. After seeking and obtaining permission from IBM to do so, HP assertedly has now produced a fully unredacted copy of the January 1, 1996 agreement. *See* Vaughn Decl. (Dkt. No. 95) Exh. A, at 39.

13. The request for production of HP license agreements with IBM and Intel continues to gen-

erate controversy. During a recent hearing HP represented that it would produce any license agreements relating to the manufacture of accused products, but only on condition that CRF would restrict access to such discovery materials more severely than contemplated by the parties in the negotiated protective order.

forth with specificity the grounds upon any such documents are being withheld.

### e) *CRF Second RFP Nos. 31 and 32*

RFP No. 31 seeks documents related to any interaction between HP and various designated third parties, including IBM, Intel, Compaq, Michael J. Flynn and Gerald S. Tjaden, concerning "the structural, functional, operational or performance characteristics of any HP CPU[.]" McKenzie Decl. (Dkt. No. 93) Exh. 13. HP objects to this request on a variety of grounds including attorney-client privilege, the work product doctrine, and the fact that such documents are not within its possession, custody or control. *Id.* HP goes on in its response, however, to offer to produce "responsive, relevant, non-privileged documents to the extent they exist" once non-claim construction discovery is opened. *Id.* Plaintiffs question the limited response it has since received to this request.

In their Second RFP No. 32, plaintiffs seek documents "reflecting, referring or relating to communications, opinions, studies or analyses that discuss, describe, explain or analyze the structural, functional, operational or performance characteristics of any HP CPU." McKenzie Decl. (Dkt. No. 93) Exh. 14. HP has objected to this request on a number of bases, including its overbreadth, but in the end has stated that subject to any objections it may have, it will produce "responsive, relevant, non-privileged documents to the extent they exist" following the entry of an appropriate protective order. *Id.*

In their motion, CRF asserts that despite the passage of time and the entry of a protective order, as of March of 2003 they were unaware of any documents produced by HP in response to these requests. McKenzie Letter dated 3/14/03 (Dkt. No. 91) at 13–14. HP, on the other hand, asserts that to the contrary it "has produced all responsive documents of which it is presently aware." Brown Letter dated 3/21/03 (Dkt. No. 92) at 9.

These two requests, to the extent that they address the PA–8000 family of processors, appear to be appropriate, and request that CRF be furnished information falling comfortably within the bounds of relevance. HP will therefore be directed to promptly comply with these two requests by affirmatively stating that it has produced all documents responsive to them, and to identify them—with sufficient particularity to allow CRF to understand from the response what documents have been produced in response to the requests—and also affirmatively identifying any documents which have been withheld that would otherwise be responsive to this request, and on what basis.

### f) *CRF Fourth RFP Nos. 6–49*

These requests, which are facially more refined than CRF's initial document requests though nonetheless still exceedingly broad, seek documents related to a variety of issues. McKenzie Decl. (Dkt. No. 93) Exh. 8. In those RFPs, *inter alia*, CRF seeks the identification of documents that would support or contradict to various legal positions taken by HP in the action, including in the various affirmative defenses contained within HP's answer. *See, e.g., id.* Exh. 8 Nos. 6, 7, 8. Various of the requests appear from documents available to the court to be redundant of earlier requests, and several are patently overbroad in their scope.

Typical of HP's initial responses to these interrogatories is the statement that subject to various objections interposed, it will produce documents "sufficient to support" various assertions and affirmative defenses, "that are within the scope of permissible discovery." McKenzie Decl. (Dkt. No. 93) Exh. 8. In its response to CRF's efforts to enforce these RFPs, HP characterizes them as representing an endeavor by CRF to "throw in the kitchen sink" and challenges plaintiffs' efforts primarily based upon their alleged failure to meet and confer in connection with these RFPs. Brown Letter dated 3/21/03 (Dkt. No. 92) at 9–10.

█ To the extent that through these RFPs CRF seeks to learn precisely what documents upon which HP intends to rely at trial to support assertions contained within its answer, including in its affirmative defenses, those requests are eminently reasonable, and should be answered. *Cf.* Fed. R.Civ.P. 26(a)(1)(B). Beyond that, however, to require HP to ascertain which documents

may be contradictory or conflicting to any legal position taken by it in the hugely complex patent infringement action seems excessive and unwarranted, and responses to those portions of the requests will not be required. Consequently, I will direct HP to respond to these RFPs only to the extent of identifying any documents upon which it intends to rely at trial to support each of the assertions or affirmative defenses referenced in the RFPs, with the admonition that any such documents not properly identified and produced but later offered at trial may be excluded by the trial court from admission into evidence. Consequently, defendant will be required to answer Nos. 6, 7 and 8 of plaintiffs' fourth RFP, though solely to the extent of identifying and producing any documents upon which HP intends to rely at trial to support the propositions referenced in those specific requests.

The remaining portions of the disputed fourth RFP are more troublesome. Many of the requests are both excessively broad and, to varying degrees, ambiguous. Typical of such requests is the following:

> All documents reflecting, referring or relating to any and all practices, approaches, policies or procedures of Hewlett–Packard with respect to the licensing or acquisition of patents, patent applications and other intellectual property.

McKenzie Decl. (Dkt. No. 93) Exh. 8 No. 13. I am hesitant to order compliance with such a sweeping request, absent a compelling reason to do so. More fundamentally, such requests, which the court is now being asked to enforce in a relative vacuum without the benefit of knowing the results of the parties' good faith efforts to narrow their scope to be more manageable and calculated to lead to the discovery of admissible evidence, are not yet ripe for determination. Consequently, with regard to the remaining portions of this request I will direct the parties to confer and, to the extent that agreement cannot be reached, will afford plaintiffs the opportunity to reapply to the court for a directive that HP comply with them as narrowed and more clearly defined in their scope.

### 3. Efforts by HP To Block Compliance with Non-party Subpoenas to IBM and Intel

This issue surrounds the contention that HP has improperly engaged in conduct aimed at blocking efforts by plaintiffs to acquire, through the issuance of non-party subpoenas pursuant to Rule 45 of the Federal Rules of Civil Procedure, highly relevant documents from non-parties, including IBM and Intel. A lengthy discussion was conducted concerning this issue as part of the May 14, 2003 hearing, during which I expressed my view that the rules, including Rules 45 and 26(c), provide the appropriate mechanism for addressing the dispute in an appropriate forum and at a time when all interested parties, including any such subpoenaed party, CRF and HP, can be heard.[14] At this point, it does not appear that this issue requires my intervention, and I will therefore not address it in my order.

### 4. Non-liability Opinions, Test and Related Discovery

In this portion of their motion, plaintiffs seek to probe questions of infringement and willfulness by requesting HP to identify and produce various documents including any opinions of non-liability with regard to the '115 patent. Those efforts implicate Cornell Interrogatory No. 2 and RFP No. 1 (McKenzie Decl. (Dkt. No. 93) Exhs. 17, 32), as well as CRF's Fourth RFP Nos. 100–105. *Id.* Exh. 8. In its original motion, CRF maintained that as of that time of its filing HP had not identified or provided so much as a single document in answer to those requests, nor had any documents withheld but falling within the scope of the requests been included in a proper privilege log.

The primary, though not exclusive, thrust of the requests falling within this category is to garner information related to attorney opinions of non-liability, presumably to be offered by HP to rebut a finding of willful infringement. In its responsive submission to the court, HP agreed that on or before a deadline which has since passed it would

---

14. Indeed, since the date of the hearing CRF has made efforts in this court and elsewhere to enforce subpoenas issued to IBM seeking the information now in dispute.

disclose to the plaintiffs any non-liability opinions upon which it intends to rely at trial. To this extent the parties appear to be in agreement as to the appropriateness of such a compromise. The parties differ, however, as to the scope of any attorney-client privilege waiver associated with such opinions of counsel to be relied upon at trial. HP, without citing any authority, argues that the waiver applies only to any communications between HP and opinion counsel on the same subject matter of the opinion, as well as things relied upon by opinion counsel, but should "not apply to any communications between HP and litigation counsel." Brown Letter dated March 21, 2003 (Dkt. No. 92) at 11. CRF, on the other hand, contends that the waiver extends not only to the opinions to be relied upon, but to evidence which "may undermine, conflict with, or be in any way inconsistent with the opinion relied upon by the infringer" and additionally should extend "to any and all materials available to the attorneys rendering the advice that is in any way related to the non-liability opinions, including work product materials." McKenzie Letter dated March 14, 2003 (Dkt. No. 91) at 17–18.

During the May 14, 2003 hearing HP augmented its response by noting that there is only one opinion falling within this category and advising that it would produce that opinion. From the parties' submissions, however, it appears that they differ concerning the significance of that disclosure and the scope of any attorney-client privilege or work product doctrine waiver resulting from reliance upon that opinion.[15]

The issue at hand is governed, in the first instance, by Rule 501 of the Federal Rules of Evidence, which in a case such as this provides that matters of privilege are informed by decisional authority of the federal courts "in the light of reason and experience." Fed. R.Evid. 501; *see also United States v. Goldberger & Dubin, P.C.,* 935 F.2d 501, 505 (2d Cir.1991). As is true with regard to other discovery exemptions, such as attorney work product, the burden of establishing entitlement to claim privilege, including all of the required elements associated with such a claim, falls upon the party seeking to invoke its protection. *von Bulow v. von Bulow,* 811 F.2d 136, 144 (2d Cir.), *cert. denied sub nom., Reynolds v. von Bulow by Auersperg,* 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987); *see generally Lawyers Title Ins. Corp. v. Bank of New York,* No. 90 Civ. 6529, 1991 WL 158961, at *1 (S.D.N.Y. Aug.12, 1991) (citing *United States v. Stern,* 511 F.2d 1364, 1367 (2d Cir.), *cert. denied,* 423 U.S. 829, 96 S.Ct. 47, 46 L.Ed.2d 46 (1975)).

Although variously stated, depending upon the context in which it has been presented, the attorney-client privilege is generally thought to encompass eight distinct elements, applying in instances

> (1) where legal advice of any kind is sought (2) from a professional legal adviser [sic] in his capacity as such, (3) the communications relating to that purpose (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser [sic], (8) except the protection be waived.

*Golden Trade, S.r.L. v. Lee Apparel Co.,* 143 F.R.D. 514, 517 (S.D.N.Y.1992) (quoting 8 J. Wigmore, Evidence § 2292 at 554 (McNaughton Rev.1961)). It has been noted, moreover, that while this formulation is obviously limited to communications from client to attorney, "courts appear to hold that the same protection should extend to legal advice rendered by the attorney, at least if it might reflect or reveal the client's confidential communications." *Lee Apparel Co.,* 143 F.R.D. at 517–18 (collecting cases).

In determining whether it should apply, a court should not lose sight of the strong policy considerations which form the underpinning of the attorney-client privilege—one which is deeply rooted in our country's jurisprudence, and finds its origins in English common law. *See Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682,

---

**15.** CRF also maintains that HP's assertion of the defenses of laches and estoppel entitle them to discovery regarding the advice of HP's counsel, a proposition for which there is at least some support. *See IPPV Enterprises v. Cable/Home Communication Corp.,* 26 U.S.P.Q.2d 1714, 1716, 1993 WL 186168 (S.D.Cal.1993).

66 L.Ed.2d 584 (1981) (citing 8 J. Wigmore, Evidence § 2290). In serving its underlying policy considerations the privilege seeks "to encourage full and frank communication between attorneys and their clients". *Upjohn Co.*, 449 U.S. at 389, 101 S.Ct. at 682. It is generally thought that serious encroachment upon this privilege would vastly undermine the ability of an attorney to represent a client effectively, and would have a potentially chilling effect upon the unfettered and candid flow of communications necessary for proper fulfillment of an attorney's role. *Id.*; *see also* 24 Charles Alan Wright & Kenneth W. Graham, Jr. Federal Practice & Procedure, Evidence § 5472 (1986 & 2003).

■ It is well established that notwithstanding the historical underpinnings of the privilege, an alleged infringer who, during the course of defending against infringement claims, signals an intention to rely upon advice of counsel to avoid a finding of willful infringement, waives any claim of attorney-client privilege or work product protection with regard to matters associated with the non-infringement opinion. *Novartis Pharms. Corp. v. Eon Labs Mfg., Inc.*, 206 F.R.D. 396, 398 (D.Del.2002); *Micron Separations, Inc. v. Pall Corp.*, 159 F.R.D. 361, 363–64 (D.Mass.1995). While this much does not appear to be controversial, the parties' positions diverge with regard to the scope of the waiver and specifically what materials in addition to the actual opinion letter must be disclosed.

The analysis as to the proper scope to attribute to the limited waiver resulting from reliance upon advice of counsel must begin with the precept that the willful infringement inquiry is focused upon the alleged infringer's state of mind at the time of infringement. *See Dunhall Pharms., Inc. v. Discus Dental, Inc.*, 994 F.Supp. 1202, 1203–04 (C.D.Cal.1998); *Micron Separations, Inc.*, 159 F.R.D. at 363. This fact has led some courts to construe the waiver requirement narrowly, and thus to mandate disclosure only of materials actually communicated to the alleged infringer prior to the time of infringement. *See Dunhall Pharms., Inc.*, 994 F.Supp. at 1203–04; *Micron Separa-*

*tions, Inc.*, 159 F.R.D. at 363–65. It is true that in patent cases, as elsewhere, any waiver of the privilege resulting from reliance upon advice of counsel is generally construed narrowly. *Kelsey–Hayes Co. v. Motor Wheel Corp.*, 155 F.R.D. 170, 172 (W.D.Mich.1991) (citing *Fonar Corp. v. Johnson & Johnson*, 227 U.S.P.Q. 886, 888, 1985 WL 186693 (D.Mass.1985)). As one court has cautioned, however,

> [a] narrowly circumscribed waiver, at the discovery state, creates a danger of a defendant utilizing favorable opinion letters while allowing unfavorable evidence to languish in their attorney's files under the protection of the work product doctrine.

*Dunhall Pharms.*, 994 F.Supp. at 1204. For this reason, courts have generally extended the scope of the waiver beyond merely those communications between counsel and client which would be admissible at trial, in recognition of the fact that the scope of discovery traditionally extends beyond the bounds of admissibility. *Dunhall Pharms.*, 994 F.Supp. at 1204–05.

■ Having considered the matter carefully, I agree with those courts that have extended the waiver beyond the limits of admissibility, and therefore will order HP to produce all materials related to the opinion disclosed by HP, including documents or materials used by or prepared by HP or its counsel and referred to in the opinion, as well as any other opinions which support, contradict or weaken the attorney's opinions. *Kelsey–Hayes*, 155 F.R.D. at 172; *see also Novartis Pharms.*, 206 F.R.D. at 399 ("In the Court's view, it is critical for the patentee to have a full opportunity to probe, not only the state of mind of the infringer, but also the mind of the infringer's lawyer upon which the infringer so firmly relied. There is no reason why the alleged infringer's waiver of the attorney-client privilege should not be considered absolute, encompassing materials typically protected by the work product doctrine."). I will also require HP to provide a more complete privilege log identifying any materials relating to this issue which have been withheld notwithstanding my ruling.[16]

---

**16.** During the pendency of these cross-motions, the parties periodically have presented the court

#### 5. *Technical Specifications, Drawings and Schematics*

The fifth issue is actually comprised of two sub-issues. Initially, in its second RFP CRF has requested technical specifications, drawings and schematics for the accused processors, including the HP–8000 series. *See* McKenzie Decl. (Dkt. No. 93) Exh. 19. Also implicated is a request by the plaintiffs, memorialized in their Fourth RFP Nos. 68–70, seeking any such technical drawings or specifications provided by HP to IBM, or by IBM and/or Intel to HP. *Id.* Exh. 8. These requests, which are seemingly noncontroversial, are not challenged *per se* by HP. The genesis of this particular controversy primarily has to do with HP's unwillingness to provide such data in electronic or digital form, plaintiffs' counsel asserting that the hard copies produced are in many respects incomplete, illegible, and/or incomprehensible without the assistance of additional information or explanation. HP responds that it has provided the corresponding hard copy schematics, and has gone to considerable expense—which it has chosen to absorb—to make them more legible and/or to enlarge them when requested, and further has offered to provide additional detail or information in response to any specific requests. HP also objects to the production of its "highly confidential and proprietary" electronic filings as being far more intrusive than the production of hard copies.

##### a) *Technical Specifications in Digital Format*

At first glance, plaintiffs' request for access to digitally stored specifications and similar information related to the accused HP devices falls comfortably within the bounds of permissible discovery. Rule 34 of the Federal Rules of Civil Procedure permits a litigant to request from another party "any designated documents (including writings, drawings, graphs, charts, photographs, phonorecords, and other data compilations from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonably usable form)" for inspection and, if requested, for copying. Fed.R.Civ.P. 34. Rule 34 permits discovery of electronically or digitally stored information provided, of course, that it meets the relevance test articulated in the rules governing pretrial discovery and there is no other proper basis for denying or restricting the discovery sought. *Medtronic Sofamor Danek, Inc. v. Michelson,* No. 01–2373, 2003 WL 21468573, at *1–2 (W.D.Tenn. May 13, 2003); *Anti–Monopoly, Inc. v. Hasbro, Inc.,* 94CIV.2120, 1995 WL 649934, at *2 (S.D.N.Y. Nov.3, 1995) ("today it is black letter law that computerized data is discoverable if relevant"); *see also Jones v. Goord,* No. 95 CIV. 8026, 2002 WL 1007614, at *6 (S.D.N.Y. May 16, 2002) (framework for analyzing discovery dispute under Rule 26 of the Federal Rules of Civil Procedure "applies to requests for electronic or computer-based information just as it applies to more traditional materials", citing 8A Wright, Miller & Marcus, Federal Practice and Procedure § 2218, at 451 (2d ed.1994)).

The scope of discovery, in turn, is informed by Rule 26 of the Federal Rules of Civil Procedure, a rule which, while scaled back by virtue of amendments implemented in December of 2000, has historically been viewed by the courts broadly in recognition of the fact that the federal rules are structured in such a way as to require only minimal, notice pleading while as a trade-off liberally affording parties the opportunity to acquire evidence and to probe an adversary's contentions through pretrial discovery. *Jones,* 2002

---

with correspondence volleys addressing issues of varying degrees of significance. Most recently, plaintiffs' counsel initiated the process by accusing HP's attorneys of making misrepresentations to the court during the May 14, 2003 hearing concerning the nonexistence of documents which were disclosed to CRF's counsel two weeks later on May 28, 2003. Defendant's attorneys have since responded in kind by expressing ire at the plaintiffs' actions and additionally accusing plaintiffs' attorneys of receiving a document which was inadvertently disclosed by HP despite its attorney-client privilege status and not only failing to return the document but in fact bringing it to the court's attention and relying upon it for its own purposes. These are the sort of distractions, raising issues that are not ripe for determination, that are counterproductive to the orderly and civil adjudication of the parties' claims and defenses, and consequently will not be entertained by the court at this juncture.

WL 1007614, at *1 ("Broad discovery is a cornerstone of the litigation process contemplated by the Federal Rules of Civil Procedure."); *see also Zubulake v. UBS Warburg LLC,* 217 F.R.D. 309, 316–17 (S.D.N.Y.2003).

When making a Rule 26 analysis, the court's first focus must be addressed to the relevance of the information sought to the claims and defenses at play in the action. Fed.R.Civ.P. 26; *Jones,* 2002 WL 1007614, at *5–6. In this instance, in resisting discovery HP understandably does not question the relevance of the information sought by the plaintiffs. Indeed, the technical specifications in drawings related to the PA–8000 processors—the accused devices at issue in the case—is not only directly and highly relevant, but indeed is critical to the infringement claims asserted in the case.

A finding of relevance, however, does not end an inquiry. Instead, the court, in exercising its discretion to establish suitable parameters for pretrial discovery, may limit discovery of otherwise relevant material on a variety of grounds, including when

> (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive ... or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

Fed.R.Civ.P. 26(b)(2); *Jones,* 2002 WL 1007614, at *5–6. These inquiries are, by definition, generally case specific.

Perhaps the most typical case in which electronic or digital discovery disputes arise involves the expense associated with compliance, and the issue to whom that expense, if production is ordered, should properly be allocated. *See, e.g., Medtronic Sofamor Da-*

*nek, Inc.,* 2003 WL 21468573, at *2–3; *Zubulake,* 217 F.R.D. at 311; *Rowe Entertainment, Inc. v. The William Morris Agency, Inc.,* 205 F.R.D. 421, 428–29 (S.D.N.Y.2002). In this case, HP seemingly does not assert undue expense as a basis for withholding the sought-after electronic discovery materials. Rather, it argues that discovery would be unduly cumulative, since it has gone to great lengths and considerable expense to produce the requested information in tangible, hard copy format and to answer any questions and alleviate any concerns regarding missing information or unreadable specifications by responding to supplemental requests directed at such problems.

■ The mere fact that information which as a matter of ordinary course of one's business is electronically stored has been produced in functional equivalent, such as through hard copy, does not in and of itself excuse a party from producing the requested information in electronic form.[17] *Anti–Monopoly, Inc.,* 1995 WL 649934, at *2 (citing *National Union Electric Corp. v. Matsushita Electric Industrial Co.,* 494 F.Supp. 1257, 1261 (E.D.Pa.1980) and 8A Wright, Miller & Marcus, Federal Practice and Procedure § 2218, at 452 & n. 13). Nonetheless, HP is entitled to argue that because of its efforts it should be protected against electronic production which would be cumulative of what has been produced to the plaintiffs.

■ I have been provided with substantial information concerning the drawings and specifications produced by HP in hard copy format to CRF. That information tends to confirm that HP has indeed gone to great expense and effort to provide the plaintiffs with the sought-after information in a format which is understandable and complete. Nonetheless, the information sought, as previously noted, is critical to the question of infringement. It is in this regard perhaps that the case most heavily relied upon by

---

**17.** During oral argument, HP's counsel argued that the hard copy drawings and specifications produced to CRF were in the same format utilized by HP to maintain such matters on file in the ordinary course of its business. *See* 5/14/03 Transcript (Dkt. No. 115) at 122. This position is directly contradicted by the deposition testimony of Douglas Benson Hunt, a witness produced by HP to testify pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, who flatly stated that "schematics are kept in electronic form in the normal course of business." McKenzie Decl. (Dkt. No. 93) Exh. 28 at 34.

HP—*Jones v. Goord*—is distinguishable, since the computer information sought in that case appears to have been of far more marginal relevance to the claims and defenses at issue in that case. *See* 2002 WL 1007614, at *7. Moreover, there does not appear to be considerable expense to HP associated with what is being suggested by the plaintiffs as a fair compromise. Since it appears from the parties' submissions that HP's electronic specifications are stored in one location—its facility at Ft. Collins, Colorado—and can only be viewed using its software, as a compromise CRF has offered to send its technical expert to the HP facility and review the technical specifications in their electronic format in order to satisfy plaintiffs that they have received all of the information relative to those specifications for the accused devices. *See* 5/14/03 Transcript (Dkt. No. 115) at 125–27. While HP vigorously resists this proposal, contending that such an exercise would be unduly invasive and entail additional expense to the company, it does not provide any specifics concerning these assertions. Nor is there any reason to believe that such an endeavor would be either invasive or unduly expensive, particularly when compared to the expense of litigating this case to date and the extent of the parties' pretrial discovery efforts. In terms of the confidentiality of the information sought, if—as HP suggests—it has provided plaintiffs with everything of relevance concerning the specifications for the accused devices, then it cannot seriously contend that to provide the same information to plaintiffs' technical expert in electronic format would expose confidential information not previously supplied during discovery and subject, of course, to the parties' confidentiality agreement.

Under the circumstances, and after considering carefully the arguments of the parties and taking into account the extent to which HP has already gone to comply with this request, I will order that it make available to plaintiffs' expert, during business hours and for a reasonable period of time not to exceed eight hours in total, the technical drawings and specifications which it maintains in the ordinary course of its business in electronic format regarding the PA–8000 family of processors, subject to such further terms and conditions to be negotiated between the parties, including parameters such as the presence of HP personnel and after CRF representations during the process.

### b) *Schematics Exchanged With Third Parties*

The second sub-issue now presented concerns schematics exchanged between HP and third parties relating to the accused products. HP initially objected to this request, and opposes CRF's motion to compel its compliance with the request based upon plaintiffs' failure to first meet and confer concerning the issue. While not minimizing the importance of insuring impasse before presenting discovery disputes to the court, I find that insofar as it relates to the PA–8000 processors, the request seeks relevant information, and will therefore require the production of such information in digital or electronic media format.

### 6. *Tracking Dependencies And Nullification*

Plaintiffs' next issue stems from CRF's Third RFP Nos. 1–9, as well as CRF Interrogatory No. 13 and accompanying Fifth RFP No. 8, all requesting information and documents concerning the tracking, detection, management and elimination, and infringement of dependencies in computer instructions and the effect of nullification on such dependencies. McKenzie Decl. (Dkt. No. 93) Exhs. 20–22. The request and the basis for it are fleshed out in more detail in a letter dated February 14, 2003 from Attorney Edward G. Poplawski to John Allcock, Esq. *Id.* Exh. 33.

In response to this inquiry HP has relied upon Rule 33(d) of the Federal Rules of Civil Procedure, contending that documents which are readily accessible and easily understandable provide plaintiffs with the necessary information responsive to this request.[18] HP

---

18. In its submission to the court CRF quantifies the materials upon which HP's Rule 33(d) response is based to include approximately 1,587 pages of technical drawings which include nomenclature specific to HP. *See* Denise L. McKen-

also asserts that it has produced all documents necessary to ascertain the requested information, and during the May 14, 2003 hearing reiterated that it is not in possession of any documents not yet produced which contain the requested information.

During the discovery motion hearing, HP indicated its willingness to answer Interrogatory No. 13, in lieu of resting upon its Rule 33(d) response. There is some question as to whether this, alone, will satisfy CRF, however, since although Interrogatory No. 13 does not specifically use the word, what is sought by CRF in this interrogatory concerns the effect of "nullification" upon the various specified dependencies in computer instructions for the accused processors. 5/14/03 Transcript (Dkt. No. 115) at 141–43. At this juncture all that can be appropriately ordered, in my estimation, is that HP provide a proper response to the interrogatory, as currently drafted, as well as the related document discovery request, Fifth RFP No. 8. If CRF is dissatisfied with the manner in which it has posed those requests, then it may choose, after reviewing HP's response, to clarify by drafting more precise requests. As part of the relief to be afforded in connection with this matter, HP will also be required to certify that it has provided CRF with access to all responsive, non-privileged documents with regard to the disputed RFPs, and that to the extent any documents have been withheld, they have been identified on a privilege log together with an indication of the basis for withholding them.[19]

### 7. *Documents Related To Damages, Laches, Estoppel And Other Issues*

CRF next complains of what it characterizes as HP's wholesale failure to respond to its Fourth RFP, served on November 13, 2002 and consisting of 127 separate requests which are said to require the production of specific documents related to the various issues in the case. McKenzie Decl. (Dkt. No.

93) Exh. 8. According to CRF, HP's responses—which were served on December 16, 2002—fall into five distinct categories, including 1) those subject only to blanket objections (Fourth RFP Nos. 9–35, 42–47, 64–75, 79, 81–87, 90–92, 100–109, 114–116, 119, 122); 2) any responsive documents that exist will not be produced since they are already in CRF's possession (Fourth RFP Nos. 4, 8, 48–60, 95–99); 3) no responsive documents exist (Fourth RFP Nos. 36–41, 88–89); 4) HP has already produced all responsive documents (Fourth RFP Nos. 1–3, 5, 61, 80, 125–126); and 5) "certain" documents which are responsive will be produced, subject to objections (Fourth RFP Nos. 73, 76–78, 93–94, 107–108, 110–113, 117–118, 120, 121, 123–124, 127).

During the May 14, 2003 hearing the parties reached apparent agreement concerning this portion of the dispute. That accord is based upon HP's commitment to supplement its responses to the disputed requests and CRF's willingness to accept that proposal, at least in the first instance. Accordingly, I will make no ruling with regard to this issue, reserving to the parties the right to reapply to the court for appropriate relief in the event of additional lingering problems associated with it.

### 8. *Privilege Log And Redactions*

In its motion, CRF also challenges HP's privilege log which, when initially produced, contained only three entries. McKenzie Decl. (Dkt. No. 93) Exh. 23. Also included within this portion of plaintiffs' application is a challenge to the fact that two of the three entries do not list the author of the document referenced, and other similar information is lacking. CRF also complains, as previously was indicated, concerning the redaction of the January 1, 1996 IBM—HP cross-license agreement.

---

zie Letter dated March 14, 2003 (Dkt. No. 91) at 23–24.

**19.** This disposition applies equally to plaintiffs' Third RFP Nos. 1–9, which apparently do specifically relate to "nullification" of computer instructions. *See* McKenzie Decl. (Dkt. No. 93) Exh. 22. HP will be similarly required to certify

to the court and plaintiffs' counsel that it has produced all documents within its possession, custody or control meeting the specifications set forth in this request, and that to the extent any such documents are being withheld they have been properly listed in a privilege log.

In its response to this issue HP has now indicated its commitment to updating its privilege log, and advises that it has now produced to plaintiffs an unredacted copy of the cross-license agreement with IBM. Under these circumstances this presents a non-issue, and HP will be directed to provide a proper privilege log, if it has not done so already, in compliance with Rule 26(b)(5) of the Federal Rules of Civil Procedure concerning any documents withheld on the basis of attorney-client privilege or the work product doctrine within thirty days of the date of this order.

### 9. Blanket Objections

Although not specifically carved out in its original letter requesting a discovery conference, in later submissions CRF has included a ninth category of disagreement, related to the various "blanket objections" interposed by HP to the many discovery requests served by the plaintiffs. The gist of CRF's argument on this score is its understandable desire to know whether any information or documents are being withheld by HP solely on the basis of these blanket objections which, but for such a general objection, would be disclosable. In both its written responses and at the May 14, 2003 hearing, HP represented to the court that no documents have been withheld solely on the basis of any such blanket objection, and has reiterated its willingness to certify to this effect. This, then, is another nonissue which can be resolved by simply requiring that HP provide such a certification—that is, to represent to CRF and the court that it is not withholding any documents solely on the basis of any blanket objections being asserted.

### 10. Shelton Drafts of the Flynn Declaration and Lotz Declaration

Although not included within CRF's initial submission, in their reply dated May 9, 2003 plaintiffs have raised yet another issue, the latest concerning Dr. Michael J. Flynn—an expert retained by HP to assist it in connection with claims construction, including at the *Markman* hearing. Specifically, CRF has requested the production of drafts prepared by Barry Shelton, an HP attorney, of a declaration prepared for Dr. Flynn's signature in connection with the issue of claim construction, and a document which has been referred to as the "Lotz declaration" which was apparently provided to Dr. Flynn, as well as any documents related to these two categories of documents, including drafts.[20, 21, 22]

#### a) Flynn Declaration Drafts

HP notes that while Dr. Flynn may potentially be designated as its expert on other, non-claim construction issues in this case, as of the discovery hearing it had not yet decided whether to make such a designation. And, citing my ruling precluding HP from discovering similar material of Dr. Smith until his designation by CRF as such an expert, HP urges that I do likewise with regard to Dr. Flynn. CRF counters that this objection has been waived since in his declaration opining on claim construction, Dr. Flynn also rendered opinions on both patent validity and infringement. *See also* 5/14/03 Hearing Transcript (Dkt. No. 115) at 155.

With regard to drafts of the Flynn declaration, HP's attorneys have represented in open court that there were no such drafts. *See* 5/14/03 Hearing Transcript (Dkt. No. 115) at 160. This, then, is a non-issue, since HP cannot be required to produce what it does not possess. HP will simply be required to reiterate this representation in the form of a certification. That certification should include an indication that defendant's counsel, including though not limited to Barry Shelton, Esq., no longer have available to them in any form—including electronic—pri-

---

**20.** Plaintiffs argue that this issue was raised by CRF in its questioning of Dr. Flynn during the *Markman* hearing, but was met with HP's representation to the trial court that the matter was currently being addressed by me in the context of discovery. *See* McKenzie letter dated May 9, 2003 (Dkt. No. 185) at 10; *see also* 5/14/03 Hearing Transcript (Dkt. No. 115) at 156, 159.

**21.** HP also asserts CRF's failure to first meet and confer concerning the issue before presenting it to the court. 5/14/03 Hearing Transcript (Dkt. No. 115) at 157.

**22.** The person referenced is Jonathan Philip Lotz, an HP employee whose deposition was apparently taken in July of 2002.

or drafts of Dr. Flynn's declaration, particularly in view of the fact that Dr. Flynn apparently testified at his deposition that Attorney Shelton assisted in the drafting of his declaration. *Id.* at 170.

#### b) *Lotz Declaration*

■ The issue of the Lotz declaration is somewhat more complicated. A draft of a declaration on behalf of Jonathan Lotz, an employee of HP, was apparently prepared for consideration, and as indicated by an e-mail from Dr. Flynn to Barry Shelton, one of HP's attorneys, it seems likely that the draft Lotz declaration was provided to Dr. Flynn, HP's claims construction expert, for his review and comment. *See* McKenzie Letter dated 5/9/03 (Dkt. No. 185) Exh. 56. HP has insisted that the Lotz declaration falls within the category of work product, as it does not relate to claim construction—the subject upon which Dr. Flynn is already designated to testify.[23] Hearing Transcript (Dkt. No. 115) at 160–61. The gist of CRF's argument in this regard is premised upon its surmise that the Lotz declaration, the subject of which is yet a mystery, speaks to the issue of infringement and/or invalidity and was reviewed and relied upon by Dr. Flynn when he opined that the PA–8000 processors do not infringe the '115 patent. *See* 5/14/03 Hearing Transcript (Dkt. No. 115) at 161–62. HP notes that while the Lotz declaration may have been reviewed by Dr. Flynn, it was not relied upon him in rendering any opinions regarding claim construction.

As HP points out, discovery is generally not permitted with respect to the opinions of expert consultants who have not been hired to testify at trial, barring exceptional circumstances.[24] Fed.R.Civ.P. 26(b)(4)(B); *United States v. 215.7 Acres of Land, More or Less,* 719 F.Supp. 273, 280 (D.De.1989) (Rule 26(b)(4)(B) applies to experts which a party

has not yet decided whether it will call at trial). This principle applies with equal force to experts who "wear two hats"—that is, experts who, while having been designated to testify at trial on a particular topic, have not been identified to experts to testify as to the issue for which discovery is sought. *E.g., Bailey v. Meister Brau, Inc.,* 57 F.R.D. 11, 13–14 (N.D.Ill.1972); *Inspiration Consol. Copper Co. v. Lumbermens Mut. Cas. Co.,* 60 F.R.D. 205, 210 (S.D.N.Y.1973). It would therefore seem, at first blush, that until Dr. Flynn is formally designated by HP as an expert who will testify at trial in matters other than mere claim construction the Lotz declaration would be protected by the work product privilege from disclosure.

The forwarding of the Lotz declaration to Dr. Flynn for his review, however, alters this result. Although the Second Circuit has not yet spoken to this issue, the Federal Circuit—following the lead of a majority of district courts in this circuit and others—has held that "the 1993 amendments to Rule 26 of the Federal Rules of Civil Procedure make clear that documents and information disclosed to a testifying expert in connection with his testimony are discoverable by the opposing party, *whether or not the expert relies on the documents and information in preparing his report.*" *In re Pioneer Hi–Bred Int'l, Inc.,* 238 F.3d 1370, 1375 (Fed.Cir. 2001) (emphasis added); *see also Construction Indus, Servs. Corp. v. Hanover Ins. Co.,* 206 F.R.D. 43, 50–51 (E.D.N.Y.2001) (listing cases). Key to this determination is what the drafters of the Federal Rules meant by the word "considered" in Rule 26(a)(2) when it required a testifying expert's report to contain a complete statement of his or her opinions and reasoning, including "the data or other information *considered* by the witness in forming the opinions." Fed.R.Civ.P.

---

**23.** During the 5/14/03 hearing I suggested, as a compromise, that CRF agree to disclose all materials submitted to Dr. Smith in return for permitting CRF access to the Lotz declaration. 5/14/03 Hearing Transcript (Dkt. No. 115) at 168–69. Unfortunately, however, CRF was unwilling to accept this proposal.

**24.** Rule 26(b)(4)(B) states, in relevant part:
A party may ... discover facts known or opinions held by an expert who has been retained

or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial ... upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.
Fed.R.Civ.P. 26.

26(a)(2) (emphasis added). In *In re Pioneer Hi–Bred International, Inc.*, the Federal Circuit quoted the accompanying Advisory Committee Note to Rule 26 as support for its holding that "consider" should be construed broadly:

> [the report is to disclose the data and other information considered by the expert ... Given this obligation of disclosure, litigants should no longer be able to argue that materials furnished to their experts to be used in forming their opinions—whether or not ultimately relied upon by the expert—are privileged or otherwise protected from disclosure when such persons are testifying or being deposed.

238 F.3d at 1375. As the Eastern District of New York further noted in *Construction Industry Services Corp. v. Hanover Insurance Co.*, the drafters of Rule 26 clearly contemplated that the term "considered" encompasses a broader range of conduct than "relied", particularly in view of the fact that the drafters explicitly rejected an earlier draft using the phrase "relied upon". 206 F.R.D. at 51 (citing *Karn v. Ingersoll–Rand*, 168 F.R.D. 633, 635 (N.D.Ind.1996)).

While there is certain facial appeal to HP's suggestion that Dr. Flynn's role in this case be conceptually compartmentalized, I find that such an approach is unwarranted. It is true, based upon my *in camera* review of the document, that the Lotz declaration has nothing to do with claim construction—the only subject upon which Dr. Flynn at present has been formally designated to testify. While in *B.C.F. Oil Refining, Inc. v. Consolidated Edison Co.*, 171 F.R.D. 57 (S.D.N.Y. 1997), the Southern District of New York contemplated that a delineation of the sort now advocated by HP was theoretically possible—and therefore that documents having no relation to an expert's role need not be produced—that court went on to hold that "any ambiguity as to the role played by the expert when reviewing or generating documents should be resolved in favor of discovery." *Id.* at 62 (discussing *Beverage Marketing v. Ogilvy & Mather Direct Response, Inc.*, 563 F.Supp. 1013 (S.D.N.Y.1983) and *Detwiler v. Offenbecher*, 124 F.R.D. 545 (S.D.N.Y.1989)). Since *B.C.F. Oil* this need

for clarity has "been strictly enforced." *Construction Ind. Servs. Corp.*, 206 F.R.D. at 52 (listing cases standing for the proposition that clear delineation must exist).

Based upon my comparison of the situations addressed in those cases with the circumstances now presented, I find that the type of delineation contemplated in those cases endorsing the delineation approach cannot be achieved in this instance, where the information at issue is commingled in a single document which was indisputably given to Dr. Flynn. While it is true that in retrospect it would be possible for HP to redact portions of the Lotz declaration that did not pertain to claim construction, unless Dr. Flynn was presented with such a redacted copy it is inconceivable that he did not read the entire declaration upon receiving it. Based upon *In re Pioneer Hi–Bred International, Inc.* and its progeny, this is all that is required to overcome the work product privilege in favor of disclosure.

In sum, I find that CRF should not have to rely on HP's representation that the Lotz declaration was not considered by Flynn in forming his opinions in regard to the issue of claim construction. *B.C.F. Oil*, 171 F.R.D. at 62. Accordingly, the Lotz declaration became subject to disclosure under Rule 26 when it was provided to Dr. Flynn, a testifying expert. I will therefore instruct HP to disclose the declaration to CRF.

### D. *HP Motion*

In its motion, HP has raised seven separate issues which have also been catalogued for the court's convenience. I will follow the same format in addressing its motion as well as CRF's response.

#### 1. *CRF Interrogatory Responses*

Initially, HP has raised the sufficiency of plaintiffs' responses to interrogatories related to claim construction, licensing and negotiations, and awareness of prior art. At issue in connection with this request are HP Interrogatory Nos. 3 and 13, related to plaintiff's claim construction contentions; Interrogatory No. 5, dealing with licensing and negotiations; and Interrogatory No. 12, seeking in-

formation concerning awareness of prior art. *See* Brown Decl. (Dkt. No. 168) Exh. B.

### a) *Claim Construction Interrogatories*

HP, who in response to CRF's motion suggests that contention interrogatories are premature, has by the same token sought the same type of information from CRF previously, and now once again, as to the issue of claim construction. Specifically, HP requests that I instruct CRF to prepare a claim construction chart setting forth, with regard to each claim, a proposed claim construction and a statement of why each accused device does or does not meet this claim element. HP has offered to reciprocate by preparing a similar claim chart.

While initially asserting that they have responded to the extent that they can, and that a more refined response on their part requires HP first to provide more complete discovery, plaintiffs have noted that as a result of the parties' efforts to discuss this request the scope has been narrowed, and CRF has agreed to answer HP's redefined request. CRF will be required to honor its commitment and do so, if it has not done so previously, within a reasonable, specified time period.

### b) *Licensing and Negotiations*

In Interrogatory No. 5, HP seeks information concerning licensing and negotiations for rights under the '115 patent. HP questions the sufficiency of CRF's response, which cites Rule 33(d) of the Federal Rules of Civil Procedure and references documents which, they contend, do not comprise all of the communications between CRF and the various parties. At issue are licenses apparently negotiated under the '115 patent with various licensees, including Intel, IBM, AMD, Metaflow and HP. CRF responds by stating that it is has answered this interrogatory to the best of its ability, given that it involves matters which extend back more than ten years and personnel no longer employed by CRF. CRF has offered, however, to search further and provide supplementation as necessary. This, then, is a non-issue, and CRF will simply be ordered to honor its commitment by a specific date and to state affirmatively that it has done so.

### c) *Awareness of Prior Art*

Interrogatory No. 12 seeks information concerning plaintiff's awareness of prior art related to the '115 patent. CRF, apparently acknowledging the relevance of such an inquiry, maintains that it has fully answered this interrogatory and that the information now sought extends beyond the query, as originally drafted. Nonetheless, CRF has agreed to answer the interrogatory, as modified, by providing information concerning individuals and will be ordered to fulfill its promise in this regard.

### 2. *Failure To Produce Documents and Supplement RFP Responses*

HP's second discovery issue relates to a perceived insufficiency in document production and supplementation by CRF of its RFP responses. The RFPs in issue request information concerning the invention claimed in the '115 patent (CRF RFP Nos. 9, 10, 12, 28 and 29); Cornell RFP Nos. 7, 8, 10, 18 and 19 to Cornell; prior art and invalidity (RFP Nos. 31, 32 and 33 and Cornell RFP Nos. 21, 22 and 23); charges of infringement under the '115 patent (CRF RFP No. 42 and Cornell RFP No. 31); and research agreements concerning the subject matter of the '115 patent (CRF RFP No. 51 to CRF and Cornell RFP No. 40). Also implicated are CRF's responses to HP's second document request, addressing a variety of similar issues. Brown Decl. (Dkt. No. 168) Exh. B at 100–146. In support of its position HP essentially notes the modest quantity of documents identified and produced by the plaintiffs in accordance with those requests, and questions the sufficiency of plaintiffs' responses both because of the limited extent of production and in light of the deposition testimony of inventor Dr. Torng, who stated that he turned over relevant documents to plaintiffs' counsel. As relief, HP seeks certification that in fact full production has occurred.

In response to this aspect of HP's motion CRF states that it has made a full search in an effort to comply with HP's 232 document demands, noting that many of the requested documents relate to events extending back

some ten to twenty years ago, or even longer. Plaintiffs assert further that they have made full production of all documents which are neither privileged nor withholdable under the work product doctrine that have been located, using duly diligent efforts.

During the May 14, 2003 hearing the parties agreed that this issue could be resolved with a commitment by the plaintiffs to supplement their responses to the relevant requests, to the extent that any documents falling within the scope of the request and within their possession, custody or control have not yet been produced, and to certify that all such documents have been produced. This, then, presents another non-issue, and plaintiffs will be ordered to fulfill this commitment.

### 3. *HP Copying Charges*

The third issue raised by HP concerns CRF's failure to reimburse HP's counsel for outstanding copying charges in the amount of $5,927.95.[25] In its response CRF has agreed to make this payment, and will therefore be ordered to make payment in that amount, if it has not already done so.

### 4. *Document Confidentiality Level Designations*

Early on in this litigation the parties stipulated to, and I approved, a confidentiality order setting forth rather aggressive restrictions concerning the use of documents produced by the parties during pretrial discovery and designated as confidential. *See* Dkt. No. 21. HP complains about certain designations under this agreement, including CRF's denomination of its privilege log and various communications between plaintiffs and third parties as "Confidential—Level 1"—the most restricted level under the protective order. HP requests a court order redesignating those documents as "Confidential—Level 2"—a designation which would reduce the restrictions associated with use of those documents.[26]

In response to this request, CRF has agreed to redesignate its privilege log as "Confidential—Level 2", a designation which, parenthetically, currently attaches to HP's privilege log. With regard to third party communications, during the May 14, 2003 hearing a compromise was discussed and reached. Under the terms of the proposal, which I endorse, the third party communications designated as "Confidential—Level 1" and notes at issue—including Bates Nos. CR310728–30, CR031735, CR0310747, CR0310762–63, and CR0310764—would be subject to an exception from the protective order, in that HP would be permitted to show any particular document within that group to two additional HP employees, other than individuals privy under the protective order to "Confidential–Level 1" documents, and would not be required to reveal the identities of those two employees to CRF, provided that the individuals to whom those documents are shown first sign an agreement to be bound by the protective order. This compromise seems eminently reasonable as a means of resolving this impasse, and the parties will be ordered to comply with their agreement in this regard.

### 5. *Sufficiency Of Privilege Log*

The fifth and final issue raised by HP surrounds the sufficiency of CRF's privilege log, and in particular the lack of information in it concerning page count for the various documents listed and indication of whether any attachments to those documents have also been withheld. In making this request

---

**25.** HP contends that this figure does not equate to its actual copying costs, and that if recovery of the full expenditures related to its production of documents, including oversized and color schematics, was sought, the amount at stake would be $25,269.32, representing the cost of reproduction of some 43,034 pages of documents.

**26.** The confidentiality order permits designation of documents dissemination of which is to be restricted in one of two ways. Information designated as "Confidential–Level 1" is accessible,

*inter alia*, by outside counsel staff, in-house counsel on a limited basis, outside consultants and experts, and the court. "Confidential–Level 2" information is disclosable to the same array of designated persons and, additionally, "any person who is an officer, director, or employee of a party and who is deemed necessary by that party's counsel for the prosecution, defense, settlement, preparation for trial, or trial of [the] action[.]" Dkt. No. 21, at 2–4, ¶ 2(b)(1).

HP notes that it was asked by plaintiffs to provide the same information, and has complied. In support of its request for this information, HP cites *O'Connor v. Boeing N. Am., Inc.*, 185 F.R.D. 272, 280 (C.D.Cal. 1999), in which another court required the production of such a log with inclusion of Bates Number references, thereby disclosing page count. *See also, e.g., Tartaglia v. Paul Revere Life Ins. Co.*, 948 F.Supp. 325, 330 (S.D.N.Y.1996).

. CRF, unfortunately, has for whatever reason chosen not to number the privileged documents withheld—a practice routinely utilized in complex litigation—and contends that neither the applicable rules governing disclosure nor the cases cited impose such an obligation. CRF asserts that it is not required to provide page information either by case law or by the rules of various other courts, including the Southern and Eastern Districts of New York, which specify the information which must be included in such a privilege log.[27]

During the May 14, 2003 hearing, CRF relented and agreed to provide information concerning page count for documents listed on its privilege log, and additionally to provide enough information concerning the existence and content of any attachments, with sufficient particularity without disclosing confidential material, to allow HP to understand the scope of what is being withheld. This understanding would include the requirement that if the attachment is being withheld, designation as to the basis for withholding the attachment, which may or may not coincide with the basis for shielding the document to which it was attached, will be given. This seems to the court to satisfy HP's concerns and be a reasonable means of resolving this issue. CRF will therefore be directed to comply with this offer.

**27.** Local Civil Rule 26.2, applicable in the Southern and Eastern Districts of New York, requires that any privilege log contain the following information regarding documents withheld:
(i) the type of document, *e.g.*, letter or memorandum; (ii) the general subject matter of the document; (iii) the date of the document; and (iv) such other information as is sufficient to identify the document for a subpoena duces

## IV. SUMMARY AND CONCLUSION

It is my hope that the foregoing provides some guidance to the parties and in some way contributes to the objective of crystalizing the parties' disclosure obligations. My goal in undertaking this task has been to ensure that a requesting party can gain some level of assurance and comfort that a full search has been made by the responding party and that subject to any documents withheld and properly identified on a privilege log, full disclosure of required documents has occurred. With this objective in mind, based upon the foregoing, it is hereby

ORDERED that CRF's motion to compel is GRANTED in part, as to the following:

1) CRF's request for basic damage calculation data, as relates to CRF Interrogatory Nos. 5 and 6 and CRF Document Request No. 5, as more specifically narrowed and delineated on pages 20–21 of this opinion;

2) CRF's request for information related to peripherals, as relates to CRF Interrogatory Nos. 5 and 6 and Document Request No. 5, as more specifically narrowed and delineated on pages 24–25 of this opinion;

3) CRF Fourth Document Request Nos. 76, 77 and 78, only with regard to PA–8000 family of processors, together with servers or workstations containing accused CPU units;

4) CRF Fourth Document Request No. 79, limited to documents specifically discussing competitors and competition for the PA–8000 family of processors together with any servers or workstations containing such CPU units;

5) CRF Fourth Document Request No. 111, limited to accused products, together with servers and workstations containing such alleged infringing CPU units;

6) CRF Interrogatory No. 8, relating to contention interrogatories—HP is required

tecum, including, where appropriate, the author of the document, the addressees of the document, and any other recipients shown in the document, and, where not apparent, the relationship of the author, addressees, and recipients to each other[.]"
Southern and Eastern Districts of New York Local Civil Rule 26.2(a)(2)(A).

to describe the factual basis for its patent exhaustion defense, and to identify all documents (whether or not in the possession, custody or control of HP) supporting that defense, and witnesses with knowledge of that defense;

7) CRF Interrogatory No. 7, as it relates to agreements with HP and third parties concerning HP–8000 family as well as any other CPU units manufactured under other labels or model numbers by or for HP which have the ability to process non-sequential instructions;

8) Cornell Request for Production No. 1; HP is to supply documents related to or identified in its answer to Cornell Interrogatory No. 3, relating to understandings or agreements between HP and any third party regarding HP patent;

9) CRF First Request for Production Nos. 5 and 6, as they related to PA–8000 processors; HP is instructed to identify documents with specificity, and identify documents being withheld that would otherwise fall within the scope of this discovery request, setting forth specific grounds for withholding them;

10) CRF Fourth Request for Production Nos. 6–8, only to the extent of identifying and producing any documents upon which HP intends to rely on at trial;

11) Cornell Interrogatory No. 2 and Request for Production No. 1 and CRF Fourth Request For Production Nos. 100–105; HP instructed to produce all materials related to non-liability opinion disclosed by HP, including documents or materials used by or prepared by HP or its counsel and referred to in the opinion, as well as any other opinions which support, contradict or weaken the attorney's opinions; HP also instructed to provide a more complete privilege log identifying any materials relating to this issue that have been withheld;

12) CRF Second Request for Production, relating to technical specifications, drawings and schematics for the accused processors, including the HP–8000 series; HP is instructed to make available to plaintiffs' expert, during business hours and for a reasonable period of time not to exceed eight hours

in total, the technical drawings and specification which it maintains in the ordinary course of business in electronic format regarding the PA–8000 family, subject to terms and conditions negotiated between the parties, including parameters such as presence of HP personnel and after CRF representations during the process;

13) CRF Fourth Request for Production Nos. 68–70 concerning schematics exchanged between HP and third parties relating to the accused products; HP is instructed to produce such information in digital or electronic media format;

14) CRF Interrogatory No. 13 and accompanying Fifth Request for Production No. 8, and CRF Third Request for Production Nos. 1–9, relating to tracking dependencies and nullification;

15) CRF's May 9, 2003 request for the Lotz declaration given to Dr. Flynn, HP's testifying expert;

16) to the extent that HP is required to make certain certifications to plaintiffs and the court, HP is instructed to certify to the court and CRF's counsel within a reasonable time period specified by the parties that:

a) it has supplied information necessary to allow CRF to calculate total number of accused devices manufactured by outside vendors which may be licensed under '115 patent, and identify specifically the documents that contain this information;

b) all documents complying with CRF Interrogatory No. 7 have been produced, with descriptions of those documents and corresponding Bates Nos.;

c) it has fully responded to Interrogatory No. 3;

d) it has produced all documents responsive to CRF Second Request for Production Nos. 31 and 32, and to identify which documents have been produced, which have been withheld and what basis, if any, for withholding;

e) it has provided CRF with access to all responsive, non-privileged documents within its possession, custody or control with regard to CRF Interrogatory No. 13, Fifth Request for Production No. 8, and CRF Third RFP

Nos. 1–9, and to extent that documents have been withheld, identify these documents on privilege log together with indication of basis for withholding;

f) it is not withholding any documents solely on the basis of the blanket objections it has asserted;

g) defendant's counsel, including though not limited to Barry Shelton, no longer have available to them in any form—including electronic—drafts of Dr. Flynn's declaration; and

15) to the extent that CRF has moved to compel HP to submit a more detailed privilege log, HP is instructed to provide a proper privilege log in compliance with Rule 26(b)(5) of the Federal Rules of Civil Procedure concerning any documents withheld on the basis of attorney-client privilege or work product doctrine within thirty (30) days of this order; and it is further

ORDERED, that CRF's motion to compel is DENIED, as follows:

1) documents requested pursuant to CRF Document Request No. 6, as that document request is unduly confusing and redundant;

2) CRF Fourth Document Request Nos. 61, 62, 64, 71, 72, 107, 108, 109, 100, 112, 113, 117, 118, and 119, as redundant and/or overbroad, without prejudice to CRF's right to renew any of these, narrowed in form, based upon a demonstration that such documents exist and that the scope of the request is reasonable, and upon a showing of relevance which outweighs the burden of production;

3) CRF Fourth RFP Nos. 9–49, without prejudice to CRF's right to reapply to court, after meeting and conferring with HP to impasse, for directive that HP comply with these requests as narrowed and more clearly defined in scope;

4) CRF's motion to compel is otherwise DENIED; and it is further

ORDERED, that HP's motion to compel discovery is GRANTED in part, in that to the extent that CRF is required to make certain certifications to defendants and the court, CRF is instructed to certify to the court and HP's counsel within a reasonable time period specified by the parties that:

1) it has responded to HP Interrogatory Nos. 3 and 13, related to plaintiff's claim construction contention, by preparing a chart as agreed by the parties;

2) it has supplemented and responded to HP Interrogatory No. 5, concerning licensing and negotiations for rights under the '115 patent;

3) it has responded to HP Interrogatory No. 12, seeking information concerning plaintiff's awareness of prior art related to the '115 patent, as modified;

4) CRF has supplemented and responded with all documents within its possession, custody or control to Requests for Production Nos. 9, 10, 12, 28, 29, 31, 32, 33, 42, 51 and HP's Second Document Request;

5) Cornell has supplemented and responded with all documents within its possession, custody or control to Request for Production Nos. 7, 8, 10, 18, 19, 21, 22, 23, 31, and 40;

6) it has provided information concerning page count for documents listed on its privilege log;

7) it has provided enough information on its privilege log concerning the existence and content of any attachments, with sufficient particularity without disclosing confidential material, to allow HP to understand the scope of what is being withheld; and

8) it has detailed on its privilege log the basis for any withheld *attachment,* as distinct from the document to which the attachment is appended; and it is further

ORDERED, that HP's motion to compel is otherwise DENIED; and it is further

ORDERED, that CRF redesignate its privilege log as "Confidential—Level 2"; and it is further

ORDERED, that both parties comply with compromise reached during May 14, 2003 hearing that third party communications designated as "Confidential—Level 1" and notes at issue—including Bates Nos. CR310728–30, CR031735, CR0310747, CR0310762–63, and CR0310764—be excepted from the protective order, in that HP would be permitted to show any particular document within that group to two additional HP employees, other

than individuals privy under the protective order to "Confidential—Level 1" documents, and would not be required to reveal the identities of those two employees to CRF, provided that the individuals to whom those documents are shown first sign an agreement to be bound by the protective order; and it is further

ORDERED that the Clerk of the Court serve a copy of this order upon counsel for the parties by regular mail.